UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TOKIO MARINE SPECIALITY INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THOMPSON BROOKS, INC., et al.,<br><br>Defendants. | Case No. 17-cv-00514-WHO<br><br>**ORDER DENYING MOTION FOR SUMMARY JUDGMENT AND STAYING THE CASE**<br><br>Re: Dkt. Nos. 20, 32 |

**INTRODUCTION**

Plaintiff Tokio Marine Specialty Insurance Company ("Tokio") moves for summary judgment claiming it owes no duty to defend or indemnify defendant Thompson Brooks, Inc. ("TBI") in two underlying lawsuits pending in state court. Tokio contends the claims are excluded from coverage under the policy, thereby excusing Tokio from its duty to defend. I conclude that Tokio continues to have a duty to defend TBI since there are factual questions regarding TBI's potential fault and whether the products completed operations hazard applies. Therefore, I DENY Tokio's Motion for Summary Judgment.

**BACKGROUND**

Tokio moves for summary judgment seeking a declaration that Tokio owes no duty to defend TBI, or partial summary judgment that it owes no duty to indemnify TBI with respect to certain claims, in two underlying lawsuits pending in Marin Superior Court: *Peterson, et. al. v. Thompson Brooks, Inc.*, Case No. CIV 1603427 ("*Peterson action*"), and *Oak Grove Construction Company, Inc. v. First Republic Bank*, et al., Case No. CIV 1502956 ("*Oak Grove* action") (together "Underlying Actions"). Tokio's Mot. for Summ. J. ("Tokio's Mot.") 1 (Dkt. No. 20).

Tokio requests a judgment declaring: (i) it owes no duty to defend because most of the claims in the Underlying Actions seek non-covered economic damages; (ii) the remaining claims are barred by the "faulty-workmanship" exclusions; and (iii) Tokio owes no duty to indemnify 2nd and 6th-11th causes of the *Peterson* action.

## I. STATE COURT LITIGATION

Both state court actions arise from TBI's 2010 engagement by Stuart and Gina Peterson as a general contractor to demolish and rebuild a house for the Petersons ("Project") in Tiburon, California ("Property"). In the *Peterson* action, plaintiffs assert claims for: (1) breach of contract; (2) accounting; (3) breach of implied warranty; (4) breach of fiduciary duty; (5) negligence; (6) fraud; (7) negligent misrepresentation; (8) unfair business practices; (9) conversion; (10) constructive trust; and (11) unjust enrichment. Declaration of Laurie Cacciari, Ex. 11 ("Peterson Complaint"). Claims 2 and 6-11 generally concern TBI's alleged noncompliance with the accounting required under the contract, unlawful business and billing practices, fraud, and unjust enrichment resulting in economic harms to the Petersons.[1] Claims 1, 3, 4 and 5 concern some of the same conduct, but also refer to alleged damage done to the Property as a result of TBI's work.[2]

---

[1] *See Peterson* Complaint ¶¶ 40, 53 ("Accounting" alleging that TBI violated its contractual duty to provide an accounting on demand and keep "full and detailed accounts" by overcharging and improperly using deposits and retentions); ¶¶ 62-63 ("Fraud," alleging TBI fraudulently made promises and representations about the completion date and estimated costs, which TBI "had no intention of performing"); ¶¶ 69-70 ("Negligent Misrepresentation," alleging TBI misrepresented material facts, made false promises, omitted and concealed material facts from the Petersons, which induced them to expand the Project and increased construction costs); ¶ 79 ("Unfair Business Practice," alleging TBI utilized unfair business practices to "obtain an unfair financial advantage over consumers . . . to deprive them of the ability to make fair comparisons between TBI and its competitors."); ¶ 85 ("Conversion," alleging TBI converted the "advance deposit monies and/or the subcontractor retention monies for their own use, and or for other projects or debts or obligations unrelated to the project."); ¶ 90 ("Constructive Trust," seeking repayment of monies misused); ¶¶ 92-93 ("Unjust enrichment," seeking return of "wrongfully obtained monies.").

[2] *See Peterson* Complaint ¶¶ 23, 25 ("Breach of Contract" alleges TBI failed to provide accurate estimates and misbilled, but also failed to adequately supervise the work and performing defective work causing the need to repair the Property); ¶¶ 48-50 ("Breach of Implied Warranty," alleging TBI impliedly warranted that "the Property and other materials were of merchantable quality . . . and were installed in a reasonable and workmanlike manner" but that the work and materials were not of merchantable quality, not maintainable, and not "fit for the purpose for which they were intended," resulting in damage to the Property); ¶ 52 ("Breach of Fiduciary Duty," alleging that TBI failed "competently perform" their work under the contract); ¶¶ 56-58 ("Negligence," alleging TBI "failed to perform their duties in a reasonable and workmanlike manner" resulting in

2

*Id*.

In the *Oak Grove* action, TBI's subcontractor for "site preparation" and "earthwork and mass excavation" sued TBI and later the Petersons for reimbursement of unpaid labor costs. The Petersons filed a cross complaint against TBI and Oak Grove alleging claims of: (1) negligence; (2) breach of implied warranty; (3) breach of contract; (4) equitable indemnity; and (5) unjust enrichment based again on the alleged misbilling by TBI and defects and damages caused to the Property by TBI's work on the Project. Cacciari Decl., Ex. 12 ("*Oak Grove* Cross-Complaint") ¶ 10.

The pleadings in the Underlying Actions are not currently settled. Declaration of David F. Feingold [Dkt. No. 24-1], ¶ 8. In addition, the Special Master appointed for the Underlying Actions recently issued Pre-Trial Order No. 1, governing discovery and other pre-trial matters. Declaration of Deborah L. Goodman [Dkt. No. 23-3], Ex. 3 at ¶ 15. Discovery in the Underlying Actions has been stayed, but the Petersons' expert is expected to produce a report by the end of April and the parties expect a site inspection will be conducted soon thereafter. *Id*. ¶¶ 16, 18-19.

## II. PROJECT TERMINATION

The parties dispute the circumstances and legal effect surrounding the end of TBI's work on the Project. According to allegations in the *Peterson* Complaint, the Petersons "terminated" TBI's contract "for cause" effective April 24, 2015 as a result of TBI's repeated breach of its duties under the contract. *Peterson* Complaint ¶ 17.[3] The Petersons' formal April 17, 2015, Notice of Termination letter states that the Petersons terminated TBI because "TBI [held] the job hostage by a work stoppage . . . stopped work and completely demobilized the site." Supplemental Declaration of Daniel Katibah [Dkt. No. 25-1], Ex. 1 at 5, 9. The Petersons considered this to be a "de facto abandonment of the job." *Id*. at 9.

According to Patrick Davis, TBI's executive vice president and the project manager on the Project, the Petersons struggled to pay construction costs in the last year of the Project.

---

damage to various portions of the Property).

[3] Before filing their action, the Petersons initiated an AIA mediation process, but waived the right to that proceeding in agreement with TBI. *Id*. ¶ 18.

3

Declaration of Patrick Davis [Dkt. No. 23-1] ¶ 9. As a result, when TBI's January and February 2015 invoices were not paid, TBI notified the Petersons effective April 4, 2015, that TBI was discontinuing work until payment was received. *Id*. ¶ 12. The Petersons responded by declaring the contract was "constructively terminated." *Id*. At the time TBI stopped work on the Project, it was "functionally complete" and only required a few "punch list" items to be serviced, maintained, corrected, repaired, or replaced. *Id*. ¶ 17. The only "incomplete" items were exterior landscaping and an outdoor water feature. *Id*. TBI asserts that the Petersons had prior to the termination, "commenced the process of occupying the buildings, as in hanging art on the wall." *Id*.

As to some of the damage alleged by the Petersons, including an instance of water intrusion, Davis believes that damage was caused by the Petersons' landscape architect who directed a change to the Project without TBI's knowledge. *Id*. ¶ 23. As to the damage to hard wood floors, Davis believes that may have been caused by deficient design by the Petersons or by failure of the contractor hired by the Petersons to install and configure the controls for that system. *Id*. ¶ 24.

Tokio relies on a mediation statement, created by the Petersons in March 2016 and sent to Tokio by TBI, to argue that after TBI was terminated the Petersons had to pay their replacement contractor $3.6 million to finish the Project, as evidence that the Project could not be considered "complete" at the time TBI stopped work. Cacciari Decl., Ex. 9.[4]

### III. INSURANCE POLICIES AND NOTIFICATION

From April 1, 2014 to April 1, 2017, Tokio covered TBI with three consecutive commercial general liability policies ("Policy"). Cacciari Decl. ¶ 4, Exs. 1-3.[5] Section 1,

---

[4] The Petersons object to and move to strike this document, arguing that it is protected by state and federal mediation privileges. Dkt. No. 24-3. Tokio points out that this document was willingly provided to Tokio by TBI, and argues that it relies on it only for the "underlying facts" which are not subject to the mediation privilege. Even if properly before me, this document does not constitute a "judicial admission" demonstrating that there is *no possibility* for coverage under the Tokio Policy.

[5] In addition, Tokio issued three excess liability insurance policies for the same period. Cacciari Decl. ¶ 5, Exs. 4-6.

4

Coverage A, subsection 1 of the Policy provides that Tokio "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." Policy at 026, 116, 189. Tokio also has "the right and duty to defend the insured against any 'suit' seeking those damages." *Id*. However, Tokio did not have a duty to defend against any suit seeking "property damage" to which the insurance does not apply. *Id*.

Under "exclusions" listed in subsection 2j. "Damage to Property," the Policy provides that it does not apply to property damage to:

> j(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or
>
> j(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.
>
> . . .
>
> Paragraph (6) of this exclusion does not apply to "property damage" included in the "products completed-operations hazard".

*Id*. at 030, 120, 193.

The "Products-completed operations hazard" ("PCOH") definition in Section V-16 provides:

> Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except . . .
>
>> (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:
>>
>>> (a) When all of the work to be done at the job site has been completed.
>>>
>>> (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.
>>>
>>> (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

5

> Work that may need service, maintenance, correction, repair or replacement but which is otherwise complete, will be treated as completed.

*Id*. at 040, 130, 203.

Prior to the inception of the *Peterson* action, Tokio received notice of the potential for claims through AIG Property Casualty Company (who insured the Property). Cacciari Decl., Ex. 7. Based on that knowledge, Tokio opened a claim and sent a Loss Acknowledgment Letter to TBI. *Id*., Ex. 8. On April 1, 2016, TBI's attorney notified Tokio that the Petersons were making additional claims against TBI, including property damage due to TBI's negligence. *Id*., Ex. 9. On April 8, 2016, Tokio sent TBI a letter explaining it did not believe there was coverage under the Policy – based in part on facts uncovered in AIG's investigation and the j(5) and j(6) exclusions – but nonetheless agreed to participate in the pre-suit mediation and reserving its rights to object to defense and liability. *Id*., Ex. 10. On October 5, 2016, in response to the filing of the *Peterson* action and TBI's request for defense, Tokio sent a letter reiterating its position that the j(5) and j(6) faulty-workmanship exclusions precluded coverage of the Petersons' claims. *Id*., Ex. 13 at 470-83. However, Tokio agreed to continue defending TBI while maintaining a reservation of rights. *Id*. In a January 31, 2017 letter, for materially similar reasons, Tokio disclaimed coverage of the *Oak Grove* action but agreed to defend TBI against the Peterson's cross-claims in that action while reserving its rights. *Id*., Ex. 14.

## LEGAL STANDARD

### I. INSURANCE POLICY INTERPRETATION

Interpretation of an insurance policy is a question of law. *Powerine Oil Co. v. Superior Court*, 37 Cal.4th 377, 390 (2005). Insurance contracts are contracts to which the ordinary rules of contractual interpretation apply. *Id*. If contractual language is clear and explicit, it governs. *Id*. An insurer's duty to defend extends to a suit which "potentially" seeks damages within the coverage of the policy. *Montrose Chemical Corp. v. Superior Court*, 6 Cal. 4th 287, 295 (1993). Whether a duty to defend arises is determined by "'comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint also give rise to a duty to defend

when they reveal a possibility that the claim may be covered by the policy facts known by the insurer at the inception of a third party lawsuit.'" *Id*. at 295 (quoting *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal.4th 1076 (1993)); *see also Gauntlett v. Illinois Union Ins. Co.*, 2012 U.S. Dist. LEXIS 131086, 2012 WL 4051218 at *6 (N.D. Cal. Sept. 13, 2012) ("Whether coverage exists does not depend on the labels given to the causes of action in the third party complaint; instead it rests on whether the alleged facts or known extrinsic facts reveal a possibility that the claim may be covered by the policy."); *Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 276-277 (1966) ("the duty to defend should be fixed by the facts which the insurer learns from the complaint, the insured, or other sources. An insurer, therefore, bears a duty to defend its insured whenever it ascertains facts which give rise to the potential of liability under the policy.").

Generally, exclusionary clauses are interpreted narrowly, whereas clauses identifying coverage are interpreted broadly. *Garvey v. State Farm Fire & Cas. Co.*, 48 Cal. 3d 395, 406 (1989). In determining the scope of the coverage and exclusionary clauses, words should be interpreted according to the plain meaning that a layman would ordinarily attach to them. *Jordan v. Allstate Ins. Co.*, 116 Cal. App. 4th 1206, 1214 (2004).

## II. SUMMARY JUDGMENT STANDARD

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 257 (1986).

On summary judgment, the Court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding a motion for summary judgment, "[c]redibility

7

1 determinations, the weighing of the evidence, and the drawing of legitimate inferences from the
2 facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony
3 does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See*
4 *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979).

**DISCUSSION**

Tokio argues it owes no duty to defend or indemnify TBI in the Underlying Actions. Tokio's Mot. 10. First, Tokio asserts that some of the Petersons' claims do not fall under the Policy's coverage, thereby excusing Tokio from liability. *Id*. Second, the remaining claims fall under the "faulty-workmanship exclusions" and are not covered by the Policy. *Id*. at 11. Third, the firing of TBI as the general contractor prior to completion of the Project renders the potentially saving PCOH clause inapplicable. *Id*. at 20. TBI, on the other hand, argues that Tokio has not offered admissible evidence showing the exclusions apply to the damage alleged by the Petersons and disputes whether the exclusions eliminate all potential coverage. TBI's Oppo. 1 (Dkt. No. 23). TBI argues discovery is needed in order to resolve factual disputes that will determine whether the exclusions apply. *Id*. 1-2. As such, TBI requests that I deny Tokio's summary judgment and dismiss or stay this case pending resolution of the Underlying Actions. *Id*. at 2.

I conclude that Tokio has a duty to defend because the claims asserted against TBI and the disputed facts create a possibility of coverage under the Policy. In particular, there are disputes of fact as to how "complete" the Project was at the time of termination (or abandonment) that implicate whether the PCOH applies. There are also facts in dispute over whose work caused the property damage and which parts of the Project were damaged that also implicate coverage.

**I.    SCOPE OF CLAIMS IN UNDERLYING ACTION**

Tokio's insurance policy only applies for damages resulting from "bodily injury" or "property damage." Policy at 026, 116, 189. Claim 1 and 3-5 of the *Peterson* action allege that TBI's actions resulted in physical damage to the Property. Peterson Complaint at ¶¶ 38, 50, 52, 58. The *Oak Grove* cross-claims also assert that damage was caused to the Property due to TBI's work. *Oak Grove* Complaint at ¶¶ 12, 20, 25, 27. Since there are facial claims for property damage, Tokio has a duty to defend TBI in both action, unless those claims fall within the

exclusions to coverage as a matter of law or based upon facts not in dispute.

## II. THE FAULTY-WORKMANSHIP EXCLUSIONS

In the *Peterson* action, a number of sections of the Complaint assert that TBI negligently performed its work resulting in "defective conditions that have caused property damage and other resultant damage . . . fall[ing] below the applicable standards of workmanship and care." *Peterson* Complaint ¶ 58. The most specific allegations of property damage are found in paragraph 58 (under the Negligence cause of action), listing damage as including "but not limited to": damage to the hardwood floors, installation problem with the metal roof hits, metal siding, faulty grading, improper installing of drainage systems, defects in stucco finishes and stone veneer, malfunctioning and defective hydronic heating system, water leaks, and scratches on window glass. *Id*. The Petersons' cross-claims in the *Oak Grove* action similarly allege that TBI negligently performed its work, causing property damage to the Project. *Oak Grove* Cross-Complaint ¶ 10.

Generally, CGL insurance policies do not to protect contractors from liability for their inferior or defective work. *Maryland Cas. Co. v. Reeder*, 221 Cal. App. 3d 961, 967 (Ct. App. 1990), *modified* (July 25, 1990). "The risk of replacing and repairing defective materials or poor workmanship has generally been considered a commercial risk which is not passed on to the liability insurer." *Id*. The question here is whether all of the claims asserted by the Petersons fall within the Policy's "faulty workmanship exclusions" under j(5) or j(6).

In moving for summary judgment, Tokio urges me to resolve an undecided issue of state law; whether the limitation in the j(5) and j(6) exclusions to "[t]hat particular part of" property is essentially irrelevant in a policy provided to a general contractor because general contractors are responsible for, and work on, the *whole* project. Under Tokio's proposed construction of that phrase, property damage anywhere on the property of a project would be excluded if it "arises out of" the work of the general contractor. I need not reach that issue here. As explained below, there are multiple disputes of material fact in play, including the state of "completion" or abandonment of the Project and whether the general contractor TBI, one of its sub-contractors, or a third-party not under the control of TBI is responsible for some of the alleged damage. I will not

9

resolve an undecided issue of state law where there are facts in dispute that may well preclude the need for me to reach it.[6]

### A. j(5) Exclusion

This exclusion covers property damage to "[t]hat particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations." Narrowly construed, this exclusion covers damage to property while it is being worked on by the insured. TBI argues this section cannot exclude coverage because there are material disputes of fact concerning whether "the damage" alleged by the Petersons arose out of TBI's operations or someone else's. TBI contends that the exact scope of the property damage alleged in the *Peterson* Complaint is broad, but at the same time not specific as to time or location of damage. TBI and the Petersons also point out that the Underlying Actions are in their infancy and discovery had been stayed by the Special Master assigned to the two actions, so that the relevant facts regarding scope of damage and the likely cause have not been adduced. *See* Declaration of Patrick Davis [Dkt. No. 23-1], Ex. 4 (Pretrial Order No. 1, setting out the written discovery response schedule).

I agree that disputes of material fact preclude a determination that Tokio has no duty to defend TBI in the Underlying Actions. Assuming that TBI's work on the Project was ongoing at the time of the damage, TBI contends that some portion of the property damage alleged by the Petersons was caused by third-parties not under the control of TBI. Davis Decl. ¶¶ 23-24. Tokio is correct that if in the Underlying Actions it is determined that TBI is not responsible for some portion of the damage, Tokio would not bear liability as to that portion. Tokio is also correct that if some portion of the damage is determined to have been caused by TBI's ongoing work, Tokio might not bear liability for that damage under the j(5) exclusion. But Tokio points to no authority

---

[6] After the hearing, Tokio filed a motion to submit supplemental authority, specifically *Archer W. Contractors, Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, No. 15-55648, 2017 WL 816891, at *2 (9th Cir. Mar. 2, 2017). Dkt. No. 32. I GRANT Tokio's motion for leave to file supplemental authority. *Archer W. Contractors*, however, addresses a question I do not and need not reach here, *i.e.*, the scope of "that particular part" and "arising out of" as applied to a general contractor. Moreover, *Archer* answered that question in the context of a coverage action seeking indemnity for liability and expressly distinguished cases addressing the question of how those provisions might apply to the "broader duty to defend." *Id.* at * 2.

that in this situation, Tokio can be excused from its duty to defend TBI until those facts have been settled.

**B.     j(6) Exclusion**

This exclusion covers property damage to "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." Narrowly construed, this exclusion covers property damage that occurs after an insured has finished its work on the property. Policy at 030, 120, 193. However, that exclusion does not apply to "property damage" included in the "products completed-operations hazard," which restores coverage for completed or abandoned work.[7] Completed is defined as "[w]hen all of the work to be done at the job site has been completed" or "when that part of the work done at a job site has been put to its intended use." Policy at 040, 130, 203.

As above, TBI argues that given the unsettled issues as to the timing and exact cause of the property damage alleged by the Petersons, there are material questions of fact that damage asserted in the Underlying Actions was *caused* by TBI's work or the work of an independent third-party and when it was caused (*e.g.*, whether it was after the termination of TBI). Relevant to the PCOH, TBI argues that there are material disputes of fact regarding whether the work at issue was either abandoned or completed (or completed enough), so that the PCOH hazard would apply to restore coverage. TBI asserts that at the time the contract was terminated the house was essentially complete and habitable and that the Petersons had started to put the house to its intended use by, for example, hanging art on the walls. Davis Decl. ¶ 17. As noted above, the PCOH covers projects completed to the extent that "that part of the work done at a job site has been put to its intended use."

Tokio argues that the Petersons and TBI have made binding judicial admissions that the Project was not "complete," precluding PCOH coverage as a matter of law. Tokio relies first on the mediation statement submitted by the Petersons showing that the Petersons hired another

---

[7] The PCOH was "designed to cover property damage that occurs after an insured's work is completed." *Clarendon Am. Ins. Co. v. Gen. Sec. Indem. Co. of Arizona*, 193 Cal. App. 4th 1311, 1317 (2011).

11

contractor after TBI and paid that contractor millions of dollars to finish the Project to argue that the Project was not sufficiently completed to be put to its intended use and was not put to its intended us. That, at most and if admissible, simply raises a dispute of fact which will likely be resolved or clarified in the Underlying Actions. In Reply, Tokio also relies on unspecified sections of the *Peterson* Complaint, as well as the Petersons' Answer to the Complaint in this case, where the Petersons admit they terminated TBI "from the Project" and that they "retained contractors and construction managers to complete their single family home." Dkt. No. 18 at 2:27 – 3:4. That the Petersons contend they needed another contractor to complete their home does not mean the Project or portions of the Project – which both sides agree was massive in scale with costs exceeding $50 million – were not sufficiently complete to invoke the PCOH. According to Davis from TBI, all that was left were "punch list items." As noted above, when determining whether a duty to defend exists, insurers must look not only to the pleadings in a case but also to extrinsic facts if "they reveal a possibility that the claim may be covered by the policy." *Montrose*, 6 Cal. 4th at 295. The "judicial admissions" relied on by Tokio do not establish as a matter of law that the PCOH does not apply.

Tokio also relies on statements by Davis from TBI that TBI "walked off the job" when the landscaping and water feature had not been completed, as well as Davis's statement that the Petersons hired another contractor to finish "punch list work" as admissions that the Project was not complete within the meaning of the PCOH. Reply. 5-6. Those statements do not stretch as far as Tokio would take them.

Tokio cites the language of the TBI/Peterson contract that defines "substantial completion" as when the work is completed enough to allow the Petersons to occupy or utilize it as well as separate provisions governing when a "certificate of substantial completion" can be issued. Cacciari Decl., Ex. 11 Contract § 9.8. On the first point, Davis argues that the work was completed enough to allow the Petersons to put it to use.[8] On the second, while Tokio points out

---

[8] Tokio relies extensively on *Clarendon Am. Ins. Co. v. Gen. Sec. Indem. Co. of Arizona*, *supra*, but the facts and allegations there are significantly different from the facts and allegations here. First, in *Clarendon* the "construction contract provided several conditions that had to be met" before the home would be considered complete, including "the recording of a Notice of

12

there is no evidence that a substantial completion certificate was secured, that is not surprising given the termination of the parties' relationship.

Finally, Tokio argues that the Project could not have been "put to its intended use" as provided in the PCOH definition of "completed" because, according to their mediation statement, the Petersons did not move in until August 2015. But that again, at most, is a disputed fact in light of Davis' assertion that the Petersons had already (prior to TBI's termination) "commenced the process of occupying the buildings," including by hanging art on the walls. Davis Decl. ¶ 17. Whether that the Project was so incomplete as to preclude the Petersons' beneficial use of it and why the Petersons did not move in until August will likely be established in the Underlying Actions. In sum, there are disputed material facts concerning whether the project was complete or functionally complete within the meaning of the PCOH provision.

There is also a factual dispute on abandonment. "The term 'abandon' is traditionally used where 'both sides to a contract expressly announce their intention to abandon it, releasing both sides from their respective duties under the contract.'" *Clarendon*, 193 Cal. App. 4th at 1319 (*quoting Amelco Electric v. City of Thousand Oaks*, 27 Cal.4th 228, 253 (2002)). "Abandonment in the construction context also results from the aggregation of numerous changes to the contract over time." *Id*. The facts as presented by TBI could support a determination that both sides walked away from the contract – TBI because it had not been paid, and the Petersons because of their frustrations with billing and timing – effectively abandoning it.[9] Again, it is likely that this issue will be resolved or clarified in the Underlying Actions.

I do not find as a matter of law or based on undisputed facts that the property damage alleged by the Petersons falls within the j(5) or j(6) exclusions or that the PCOH cannot apply.

---

Completion and the Revahs' ability to beneficially occupy the entire property." *Clarendon*, 193 Cal. App. 4th at 1314. Tokio points to no such detailed "completion" provision here. Second, "[i]t was undisputed that the construction of the Revah residence was not completed" at the time of the contractor's termination from the project and construction "of the residence continued." *Id*. This is in dispute in this case.

[9] In *Clarendon*, there was no dispute that the general contractor had been unilaterally fired and that the homeowners had continued to assert their rights under the contract, thereby precluding any argument as to abandonment. 193 Cal. App. 4th at 1319.

13

1 Tokio has a duty to defend.

## III. NON-PROPERTY DAMAGE CLAIMS

Tokio argues, in the alternative, that partial summary judgment should be entered in its favor because it bears no liability for the claims alleging intentional torts and non-covered economic damage; namely claims 2 and 6-11 in the *Peterson* action. Mot. 22.[10] It asserts that having a determination as to coverage on these claims would be useful for settlement purposes.

TBI responds that it is not necessary or prudent to reach these issues, and that I should abstain from deciding them until the state court claims are resolved and the disputed facts are determined below. As the Ninth Circuit explained in *Gov't Employees Ins. Co. v. Dizol*, 133 F.3d 1220, 1225 (9th Cir. 1998), when looking as to whether to issue a declaratory judgment in an insurance coverage case where there is an ongoing state court action, the Court should look to the factors announced in *Brillhart v. Excess Ins. Co.*, 316 U.S. 491 (1942) and its progeny. *Id*. Those factors are: (i) avoiding needless determination of state law issues; (ii) discouraging litigants from filing declaratory actions as a means of forum shopping; and (iii) avoiding duplicative litigation. *Id*. As the Ninth Circuit explained, if "there are parallel state proceedings involving the same issues and parties pending at the time the federal declaratory action is filed, there is a presumption that the entire suit should be heard in state court," but "[t]he pendency of a state court action does not, of itself, require a district court to refuse federal declaratory relief." *Id*.

The essence of the *Brillhart* factors is to impel the court to consider "the concerns of judicial administration, comity and fairness to the litigants." *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 672 (9th Cir. 2005) (internal quotation marks and citation omitted). The Ninth Circuit has noted other relevant considerations, including:

> whether the declaratory action will settle all aspects of the controversy; whether the declaratory action will serve a useful purpose in clarifying the legal relations at issue; whether the declaratory action is being sought merely for the purposes of procedural fencing or to obtain a "res judicata" advantage; or whether the use of a declaratory action will result in entanglement

---

[10] Tokio relies on California Insurance Code Section 533, that provides "an insurer is not liable for a loss caused by the willful act of the insured." Cal. Ins. Code § 533. Tokio also relies on the Policy's limitation to bodily harm and property damage. Policy at 026, 116, 189.

14

between the federal and state court systems. In addition, the district court might also consider the convenience of the parties, and the availability and relative convenience of other remedies.

*Dizol*, 133 F.3d at 1225, n. 5 (internal quotation marks and citation omitted). Consideration of these factors establishes that I should grant a stay.

Having denied Tokio's motion regarding its duty to defend in light of the allegations in the Underlying Actions and the disputes of fact that will likely be resolved in those actions, there is little that will be accomplished by further rulings from me at this juncture. As noted by TBI and the Petersons, the pleadings are not yet settled in the Underlying Actions and discovery has essentially yet to commence. The exact scope of the Petersons' claims against TBI and the exact forms of relief sought under each claim have not yet been determined. In light of this posture, not only is there is a danger that I may make an advisory opinion that could be undermined by amendments of pleadings and clarifications in the Underlying Actions, there is also a risk of entanglement between this case and the Underlying Actions.[11]

Since Tokio is providing a defense, it suffers no harm from waiting until the Underlying Actions are resolved to argue it owes no duty of indemnification on specific claims asserted by the Petersons. But requiring defendants to continue to litigate these matters in this Court, while defending the Underlying Actions, is an expensive and unnecessary burden. Providing clarification for purposes of settlement leverage does not, in and of itself, justify reaching these issues now. *See, e.g., Northfield Ins. Co. v. Civic Ctr. Hotel, LLC*, No. 3:16-CV-06056-WHO, 2017 WL 914287, at *8 (N.D. Cal. Mar. 8, 2017) ("providing settlement leverage for a party is not a very good reason to exercise jurisdiction.").

## CONCLUSION

In accordance with the foregoing, Tokio's motion for summary judgment is DENIED.[12]

---

[11] These concerns are widely recognized under California law as well. *See, e.g., Montrose Chem. Corp. v. Superior Court*, 6 Cal. 4th 287, 301 (1993) ("To eliminate the risk of inconsistent factual determinations that could prejudice the insured, a stay of the declaratory relief action pending resolution of the third party suit is appropriate when the coverage question turns on facts to be litigated in the underlying action.").

[12] Because I deny Tokio's motion, there is no need to grant TBI's Rule 56(d) motion to defer ruling until adequate discovery has been completed.

15

This action is STAYED pending resolution of the Underlying Actions. Tokio may seek to lift the stay at the conclusion of the Superior Court proceedings or at such other time as it (or any other party) believes that circumstances have changed sufficiently to warrant adjudication of the claims. The parties shall file a Joint Status Report six months from the date below, and every six months thereafter, briefly describing any developments in the Underlying Actions.

**IT IS SO ORDERED.**

Dated: April 26, 2017



William H. Orrick
United States District Judge